# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### ***

VLADIMIR GONZALEZ AMBRIOSO,

               Plaintiff,

vs.

CARMEN GARCIA LEDESMA,

               Defendant.

Case No. 2:16–cv–02091–VCF

**ORDER**

## I. Introduction

The Petitioner Vladimir Gonzalez Ambrioso (Gonzalez) petitions for the return of his child, Vladimir Francisco Gonzalez Garcia (Francisco), from the United States to Mexico, pursuant to the Convention on the Civil Aspects of International Child Abduction (the Hague Convention). Respondent Carmen Garcia Ledesma (Garcia) opposes Francisco's return. The court held a four-day bench trial from December 13-17, 2016. For the reasons explained in this order, the court denies Gonzalez's petition since he acquiesced to Francisco's removal to the United States.

## II. Procedural History

On September 2, 2015, Gonzalez initiated proceedings under the Hague Convention. (ECF No. 1). He alleges that Garcia abducted their 2-year old son, Francisco, from the state of Quintana Roo, Mexico and fled to the United States. (*Id.*) Gonzalez eventually located Garcia in Las Vegas, where he commenced this action.

On September 8, 2016, the court entered a temporary restraining order preventing Garcia from removing Francisco from the state of Nevada. (ECF No. 5). At the September 16, 2016 hearing, the court ordered Garcia not to remove Francisco from Nevada for the duration of this action. (ECF No. 11)

1

Garcia was also ordered to facilitate Skype or Facetime communication between Gonzalez and Francisco. (*Id.*)

This action was then referred to the assigned magistrate judge for a status hearing on September 19, 2016. (*Id.*)  At the hearing, the court ordered for Garcia to surrender her and Francisco's passports to her counsel and for the parties to submit a pretrial order by September 23.  (ECF No. 17).

On September 26, the parties submitted a stipulated joint prehearing order.  (ECF No. 20) Among the stipulated facts, the parties agreed that the "Mexican State of Quintana Roo was the habitual residence of the minor child immediately prior to Respondent and the minor child leaving Mexico and coming to Las Vegas, Nevada in April 2016." (*Id.* at 5).  A bench trial[1] was scheduled for December 13, 2016. (*Id.* at 29).

While preparing for trial, Gonzalez requested permission for his witnesses to testify via videoconference.  (ECF No. 27).  Garcia opposed this request as to all witnesses.  (ECF No. 28).  The court denied Gonzalez's request with a limited exception for Petitioner Gonzalez[2] and one of Francisco's pediatricians.  (ECF No. 32).  On Gonzalez's motion, the court modified the order to allow witness Delia Maria Iglesias Osoria[3] ("Delia") to testify by videoconference.  (ECF No. 36).

Trial began on December 13, 2016 and lasted four days.  Gonzales presented the following witnesses: (1) Saul Alejandro Cetzal Perera; (2) Pablo Oscar Gamboa Marino; (3) Emmanuel Perez,

---

[1] At the outset of this matter, the court and the parties believed that the court would hold an evidentiary hearing, then enter a report and recommendation.  During the multi-day evidentiary hearing, the parties consented to the court entering final judgment pursuant 28 U.S.C. § 636(c) and Local Rule IB 2-2.  The court approved the parties consent stipulation. (ECF No. 46)  For the sake of consistency, this order will refer to the December 13-16 proceedings as a bench trial.

[2] At an earlier hearing, Gonzalez's counsel represented that Gonzalez was unable to enter the United States due to an unspecified immigration issue.  (ECF No. 23)  Based on this representation, the court allowed Gonzalez to attend proceedings remotely.  (ECF No. 30)  He also testified via videoconferencing.

[3] Delia was ordered removed from the United States on July 11, 2016.  (ECF No. 33 at 7)  At the time of trial, Delia was still subject to this removal order.  Based on this representation and subsequently submitted documentary support, the court allowed Delia to testify remotely.  (ECF No. 36)

Esq.; (4) Elpidio Gonzalez Ambrioso; (5) Dr. Vladimir Francisco Ojeda Sabina; (6) Delia Maria Iglesias Osoria; (7) Francisco Javier Suarez Hamz; and (8) Vladimir Gonzalez Ambrioso.  Garcia responded with five of her own witnesses: (1) Alejandro Guzman Rivera; (2) Jorge Antonio Mendez Tocabens[4]; (3) Niurka Ledesma Lopez; (4) Ynes Rolinda Lopez Jimenez; and (5) Carmen Garcia Ledesma.  In addition to live and videoconference testimony, numerous documents, which spanned the pair's entire relationship, were received into evidence.

### III. Factual Background

The following factual summary is based on the trial testimony of the parties and their witnesses.  Where appropriate, the summary will cite to the documentary record and make credibility determinations.  Based on the evaluation of testimony and documentary evidence, the court will make separate findings of fact.

a.      Gonzalez and Garcia Begin Their Relationship

Vladimir Gonzalez Ambrioso met Carmen Garcia Ledesma in the city of Cancún, state of Quintana Roo, Mexico sometime in February of 2013.  Due to a discrepancy on her entry documents, Garcia discovered she could not remain in Mexico indefinitely.  For help, she turned to Gonzalez's brother, Elpidio Gonzalez Ambrioso (Elpidio).  Through Elpidio, Garcia was introduced to Gonzalez.[5]

Shortly after their initial meeting, Gonzalez and Garcia began a romantic relationship.  From May 2013 to July 2013, the couple lived together in an apartment in the Bonapak neighborhood of

---

[4] Witness Tocabens is Garcia's stepfather.  From February 2013 to April 2016, he resided in Havana, Cuba.  Sometime in April 2016, Tocabens moved to Las Vegas and was reunited with Garcia, Niurka, Ynes, and Francisco.  His testimony focused on Gonzalez's action after April 4, 2016 and largely overlapped with Garcia's testimony.

[5] While the parties dispute the exact circumstances of the initial meeting, these details are irrelevant to the court's inquiry.  The court will confine discussion of factual disputes regarding irrelevant details in footnotes while addressing relevant factual discrepancies in the main body of this order.

3

Cancún.  In July 2013, Garcia returned to Cuba to complete her accounting exams.  While in Cuba, she discovered she was pregnant with the couple's son, Francisco.

In mid-July 2013, Garcia called Gonzalez several times to notify him of her pregnancy.  The calls went unanswered.  The following day, Gonzalez returned Garcia's calls, informing her that their relationship was over and the he was reunited with his ex-wife Delia.  Gonzalez tried to dissuade Garcia from returning to Cancún.

Despite Gonzalez's warnings, Garcia soon returned to Cancún on July 12, 2013.  (Resp't's. Ex. L, JJ).  Gonzalez met Garcia at the airport and drove her to their shared apartment, where she discovered that Gonzalez had moved all of his belongings out of the apartment while she was in Cuba.  At this time, Gonzalez confirmed that he and Delia had renewed their relationship.  Gonzales did not want the child to cause disruption.  He asked Garcia to have an abortion, but she refused.  Gonzalez stated that if the decision to keep the baby was based on money, he would pay her.  Garcia then rented a room in Cancún before her return to Cuba in August 2013.

Gonzalez maintains that he was happy Garcia was pregnant and he never asked her to have an abortion.  He had unsuccessfully attempted to have a child with his third wife, Victoria.  He testified that his relationship with Delia was strictly platonic after their divorce.

Garcia's pregnancy announcement was the first of many instances where the parties' narratives diverged significantly.  Since a bench trial was conducted, the court sat as the finder of fact as well as the arbiter of the law.  The court must evaluate the witnesses' credibility and decide which facts to accept as true.  In this instance, the court finds Garcia's version of events more credible than Gonzalez's account.  Garcia's testimony is specific and rich with details about the beginning of the couple's tumultuous relationship.  Her testimony is also internally consistent with her narrative that the pair had

an "on-again, off-again" relationship before and after Francisco was born.  Generally, her testimony is supported by documents admitted into evidence and the testimony of other witnesses.

In contrast, Gonzalez's testimony about this period of time is largely conclusory and devoid of detail.  For instance, he was happy when he learned of Garcia's pregnancy, but other than this isolated comment his testimony glossed over the events that occurred between mid-July 2013 and February 2014.

b.    Garcia's Pre-Natal Care and Francisco's Birth

Between August 2013 and December 2013, Garcia believing that her relationship with Gonzalez was over, remained in Cuba to receive pre-natal care.[6]  During this time, Gonzalez traveled to Cuba twice to visit Garcia.  By late November of 2013, the couple renewed their romantic relationship.

Garcia returned to Cancún in December 2013. (Pet'r's. Ex. 28).  Upon her return, Gonzalez rented an apartment for Garcia in the Bonapak neighborhood[7].  Garcia asserted that Gozalez never lived in the apartment with her but cohabitated with Delia instead.  For his part, Gonzalez denied a romantic relationship with Delia and proclaimed that he cohabitated with Garcia in the second Bonapak apartment.  Gonzalez did not describe this part of the couple's relationship nor did he give a detailed explanation for Garcia's version of events.  Again the court finds Garcia's testimony credible, due to its detail and internal consistency.

Francisco was born on February 7, 2014, and the couple registered the child on February 26, 2014. (Pet'r's. Ex. 3b, 54, 55).  The birth certificate listed the same address for Gonzales, Garcia and

---

[6] Gonzalez testified that Garcia had returned to Cuba to receive treatment for a Hepatitis C infection she had as a child.  This explanation is poor.  No credible testimony or evidence explains why Garcia needed to be treated in Cuba and why she could not be treated in Mexico.

[7] At trial, there was confusion about whether the referenced Bonapak apartments were one in the same.  A subsequent explanation by the interpreter clarified that the first Bonapak apartment, where the couple undisputedly resided between May and July 2013, was a different apartment than the second Bonapak apartment.

Garcia's mother Niurka Ledesma Lopez (Niurka) as Lote 15, Manzana 09, Supermanzana 524, Cancun, Quintna Roo.  This was the second Bonapak apartment.

In April 2014, both parents consented to Francisco's Mexican passport for his travel to Cuba with Garcia.  (Resp't's. Ex. J).

Sometime after passing her accounting exams, Garcia established an accounting business in Cancún which provided her with a reliable stream of income.  (Resp't's Ex. Z, AA).  Based on her testimony at trial, Garcia was financially independent during her relationship with Gonzalez.

c.  The Gran Santa Fe II Property

In July 2014, Gonzalez purchased a home in the Gran Santa Fe II neighborhood of Cancún. Here, undisputedly, Garcia, Francisco, Niurka, Garcia's grandmother, Ynes Rolinda Lopez Jimenez (Ynes), and Garcia's cousin, resided at this home.

The parties dispute as to whether Gonzalez cohabitated with Garcia and their child in this home. Garcia, Niruka, and Ynes maintain that Gonzalez never lived in the home, but visited regularly to play with Francisco and to continue his romantic relationship with Garcia.  Garcia states that during this time, Gonzalez still cohabitated with Delia and the Gran Santa Fe II house was established as a second home, with her and their son as his second family.

Gonzalez, Elpidio, and their neighbors, Saul Alejandro Cetza Perera and Pablo Oscar Gamboa Marino, testified to support allegations that Gonzalez lived in this house from July 2014 until Garcia's departure in April 2016.

The testimony of other witnesses, Gonzalez's testimony about his relationship with Delia, and the documentary evidence support the conclusion that Gonzalez never lived in the Gran Santa Fe II house.  Garcia and the witnesses called on her behalf provide details of life in the Gran Santa Fe II

6

home.  For example, Ynes testified that Francisco looked forward to car rides with his father.  Garcia recalled that Gonzalez kept a sparse wardrobe consisting of a single dress shirt and a pair of shorts.

On the other hand, Gonzalez and his witnesses, Elpidio and the neighbors, testified in a conclusory manner.  They confirmed that Gonzalez was frequently in the neighborhood.  They also stated that during the times they visited him at home, Gonzalez "acted as if he owned the place."  Dr. Vladimir Francisco Ojeda Sabina (Dr. Ojeda)[8], the child's pediatrician, testified that Gonzalez would attend all of Francisco's medical appointments including a number of house calls made at the Gran Santa Fe II home.

Gonzalez's witnesses' testimony is equally consistent with two conclusions: (1) Gonzalez was a frequent visitor or (2) Gonzalez actually lived in the home.  The conclusory nature of the testimony and its lack of details raise suspicions.  For these reasons and the reasons stated below, the court gives more weight to Garcia's account about Gonzalez's true domicile during this period.

Gonzalez's testimony about his relationship with Delia casts serious doubt on his claim that he lived in the Gran Santa Fe II home.  He testified that he and Delia had divorced (Pet'r's. Ex. 33b), but they remain close friends.  Garcia contends that throughout her relationship with Gonzalez, he lived with Delia.  Witness testimony and documentary evidence support Garcia's version of events.

Gonzalez's account of his relationship with Delia contains many inconsistencies.  At one point during his testimony, Gonzalez stated that he and Delia separated years before their divorce.  Later, he said that he lived with Delia up until the day their divorce was finalized.  For her part, Delia testified that

---

[8] The parties also testified that Garcia encountered Dr. Ojeda on a flight from Cancún to Cuba.  They dispute the nature of the encounter, but neither party presented evidence regarding the content of any conversation that occurred.  Ultimately, details about Garcia's encounter with Dr. Ojeda are irrelevant to the court's Hague analysis.

she and Gonzalez did not take a European vacation together.  Rather, Gonzalez just happened to be in Europe at the same time she was there with their children.

Gonzalez has numerous pictures together with Delia and their daughter, Yvette.  (Pet'r's Ex. D). In one photo taken at a New Year's Eve party on December 31, 2014, Gonzalez has his arm draped around Delia, Garcia is not in any of these family photos.  *(Id.)*

Perhaps most damaging to Gonzalez's story is Garcia's credible testimony that she never visited the Delia's house and Delia very rarely came to the Gran Santa Fe II house.  When Delia did visit, it was only to attend large family gatherings.  The court finds that Gonzalez had simultaneous relationships with both women.  Gonzalez maintained separate households for each partner, lived with Delia[9], and visited Garcia regularly.  He fulfilled a leading role in both families while not intermixing the two groups.

Documents also refute Gonzalez's claim that he lived in the Gran Santa Fe II house.  Utility bills for the residence were all in Garcia's name.  (Resp't's Ex. QQ).  Gonzalez testified that he had signed the contracts for the various services (Pet'r's Ex. 44), but had opted to list Garcia as the individual responsible for monthly bills.  This is an odd, unnecessarily complex arrangement for a couple who supposedly lived together.  The court makes the reasonable inference that the arrangement resulted from Gonzalez's initial efforts to establish a home for Garcia and Francisco, and his subsequent decision to leave its day-to-day maintenance to Garcia.  Gonzalez probably concluded that an individual who lived at the home full time should be responsible for tracking and paying monthly expenses.  His conduct demonstrates that he was not such an individual.

---

[9] Other factors that support the court's conclusion include Garcia's testimony about Gonzalez's anxiety concerning Delia's attitude towards him and Delia's unexplained decision to accompany Gonzalez when he attempted to enter the United States.

Gonzalez relies on two set of documents to support his claim that he lived at the Gran Santa Fe II house. The first documents are Francisco's daycare enrollment forms. (Pet'r's. Ex. 25a) On these forms, Garcia listed the Gran Santa Fe II home as her address and wrote that Gonzalez had the "same address." The second set of documents are utility bills in Gonzalez's name that list his address as the Gran Santa Fe II house. (Pet'r's. Ex. 44) Garcia offers convincing explanations for both sets of documents.

First, Garcia filled out the daycare forms from memory and did not remember Delia's address. She chose to list her address as Gonzalez's in order to save time. Second, the utility bills are from July, August, and September of 2016. Garcia left Mexico in April. Thus Gonzalez would have had to transfer the utilities into his name or risk them being shut off for nonpayment. The court accepts Garcia's explanations and gives no weight to Gonzalez's documentary evidence on this issue.

In summation, the living situation at the Gran Santa Fe II house was as follows. Gonzalez did not live in the Gran Santa Fe II home, but visited 4-5 times a week. He spent about 30 minutes playing with Francisco then spent time with Garcia. Occasionally, Gonzalez invited his friends and business acquaintances over to discuss his various enterprises. On several occasions, Gonzalez took calls from Delia on an outside terrace.

<u>The February 2015 Incident</u>

On direct examination, Garcia recounted an incident that occurred in February of 2015. Gonzalez had promised her that he would spend the preceding holiday season with her and Francisco. Gonzalez did not fulfill his promise. Instead he spent the 2014 holidays with Delia. As a result, Garcia wanted to end their relationship. Gonzalez became extremely upset and threatened to evict Garcia and her family. After a cooling-off period, the couple reconciled. In exchange for returning to their

9

relationship, Gonzalez agreed to transfer title of the Gran Santa Fe II house to Francisco's name and consent to Francisco's obtaining a Cuban passport and registering as a Cuban national (Resp't's. Ex. R).

This arrangement provided Garcia with security should Gonzalez ever threatened her again. He would not be able to evict her from the house since was in Francisco's name. Francisco's Cuban passport and nationality would allow Garcia to relocate the child to Cuba should it become necessary.

Gonzalez frames the situation differently. The transfer of title to Francisco was a "patrimony" gift to help him get established. The Cuban passport and registration were intended to connect Francisco to his Cuban heritage. Here, the court is not persuaded by Gonzalez's explanation.

At this time, Francisco was just over one year old and likely unaware of the actions taken on his behalf. The timing of these actions support the conclusion that they were directed at assuaging Garcia's fears about her vulnerability in the couple's relationship. The court, therefore, finds Garcia's account of the February 2015 incident more credible.

e.      The March 28, 2016 Incident

The parties agree that the events of March 28, 2016 precipitated mother's and son's flight to the United States. Each party presents a completely different version of events.

        i.      *Garcia's Version of Events*

In November 2015, Gonzalez ended their relationship to pursue a woman named Claudia. Garcia acknowledged that their relationship was over, but continued living in the Gran Santa Fe II house. Gonzalez continued his visitations with Francisco after his relationship with Garcia ended.

On or about March 28, 2016, Gonzalez attempted to reconcile with Garcia because he was mistaken about Claudia. He wanted to return to a relationship with Garcia but she refused. Gonzalez became enraged. He threatened to have Garcia killed and allegedly showed her text messages between

himself and a hitman.  These messages detailed a plan to have the hitman ambush Garcia while she took Francisco to daycare.

The following day, Gonzalez confronted Garcia at the Gran Santa Fe II house.  He told Garcia and her entire family that they had 7 days to leave the house.  A few days later, his son from a previous marriage arrived at the home and retrieved the house keys.  Garcia and her family left the house.  On April 4, 2016, Garcia and her family flew from Cancún to Mexico City.  From Mexico City, they traveled through Tijuana to the United States.

ii.    *Gonzalez's Version of Events*

Gonzalez's account is radically different.  He maintains that a business associate confided to him that Garcia was involved with prostitution.  The associate allegedly provided Gonzalez with a catalog containing nude photos of Garcia.  Distraught, Gonzalez confronted Garcia with the catalog. She denied any involvement in prostitution.  Gonzalez then spent the next several days at Elpidio's house.  When he returned on April 4, 2016, he discovered that Garcia had fled with Francisco.  He was immediately concerned for the welfare of his child and began exploring possible avenues of legal recourse.

The court finds that Garcia's departure was prompted by yet another breakup of the couple's relationship.

Gonzalez's story suffers from several flaws.  First, he did not produce the supposed catalog or provide any corroborating evidence on this point.  The allegations of prostitution are central to his narrative that Garcia left abruptly and took Francisco without his approval.  Failure to support such a serious allegation with documentary evidence or some other means of corroboration casts considerable doubt on its truth.

Second, Gonzalez's sequence of events is internally inconsistent and contradicted by documents admitted into evidence. Gonzalez testified that he stayed with Elpidio after he confronted Garcia. When he returned to the Gran Santa Fe II home several days later, Garcia and Francisco had taken their belongings and left the house. However, in the affidavit submitted with his report to the Mexican authorities, Gonzalez stated that he left the Gran Santa Fe II house for work at 7 a.m. on the morning of April 4, 2016. Garcia and Francisco were still asleep when he left. When he returned home, they were gone. This inconsistency is just the beginning.[10]

Gonzalez failed to give a satisfactory explanation for why he waited until April 11, seven days after the abduction, to file a police report. (Pet'r's. Ex. 11b). Gonzalez explains that he was exploring all his legal options and, only when they turned out to be unsatisfactory, did he file a police report. This is at odds with Gonzalez's professed concern for his son. A parent would be expected to go to the authorities immediately rather than wait a week while other options were tested.

Gonzalez's original report to the police is also contradicted by Garcia's travel itinerary. Garcia states she left the Gran Santa Fe II house at 3 a.m. in the morning in order to catch a 6 a.m. flight to Mexico City. This flight is confirmed by an airport receipt dated April 4, 2016 at 5:20 a.m. documenting that Garcia checked three religious objects before boarding. (Resp't's. Ex. V) At 7 a.m. on April 4, 2016, mother and son were already on their flight to Mexico City.

f.      Communications After April 4, 2016

On or about April 4 and 5, 2016, Gonzalez sent Garcia a series of text message demanding the return of Francisco. (Pet'r's. Ex. 34b) He received no response. After several days of calling her

---

[10] Gonzalez explains that he filed a supplemental police report a few days later that corrected this fact. The supplemental report was not offered into evidence. However the filing of a supplemental report does not explain why Gonzalez misremembered such an important detail in his original report made immediately after the events reported.

family, Gonzalez eventually located Garcia and Francisco in Las Vegas, Nevada.  Gonzalez and Garcia

began communicating via Facetime and text messaging.  (Pet'r's. Ex. 34b; Resp't's. Ex. A)  Gonzalez

sent Elpidio with gifts and necessities for Francisco (Resp't's. Ex. E)  At one point, Gonzalez hired a

realtor and began looking for a house in Las Vegas.  Elpidio also began looking for a house and

explored the possibility of setting up business in the United States.

In late June 2016, Gonzalez attempted to enter the United States.  He was detained and ordered

removed.[11]  (Resp't's. Ex. KK)  Shortly, thereafter Gonzalez retained Mr. Perez, a Miami immigration

lawyer.  Mr. Perez sent letters to Garcia demanding the return of Francisco and attempted to mediate a

compromise between the parties.  In August 2016, Gonzalez retained Nevada counsel, who filed his

Hague application in this district.

Gonzalez maintains his efforts to establish a home for Garcia and Francisco in the United States

were a ruse to trick Garcia into remaining in Las Vegas with Francisco.  He tried to convince Garcia to

voluntarily return to Mexico.  When those efforts failed, Gonzalez hired U.S. counsel and began

preparing his Hague application.  His sole objective was the return of Francisco to Mexico.

Garcia's credible testimony is closer to the truth.  Once Gonzalez learned that Garcia and

Francisco were in the United States, he formulated a plan to visit, or possibly join, them in the United

States.  The couple rekindled their romance.  In text messages, Garcia refers to Gonzalez as "my love."

(Pet'r's. Ex. 34b)  Garcia testified that there was at least one phone sex interaction with Gonzalez.

Gonzalez sent gifts, contemplated purchasing a home, and had other family members visit on his behalf.

Before leaving for the United States, Gonzalez sold his car and Delia sold the home she shared with him.

---

[11] The parties disagree about the reason why Gonzalez was not allowed to enter the United States.  Gonzalez contends that it
was because he is a Cuban national, but was not seeking political asylum.  Garcia maintains that Gonzalez was denied
admission due to an alleged human-trafficking incident in Belize in 2013.   While Gonzalez's inability to enter the United
States is relevant, the precise reason behind it is not.

(Resp't's. Ex. WW)  However, Gonzalez's plans unraveled at the U.S.-Mexico border.  He and Delia were detained and eventually removed from the United States.

After his removal, Gonzalez's attitude changed.  Garcia testified that in late July or early August 2016, Gonzalez called and said "Cabrona, you going to pay for this.  I can take the child away in a good way or a bad way.  You will face charged in the U.S., and will not be able to work."  Gonzalez went on to say that if he could not be reunited with Garcia and Francisco in the United States, he would be reunited with them in Mexico.  To that end Gonzalez, started legal proceedings to have Francisco returned to Mexico.

On this final issue, the court again finds Garcia's account more credible.  Gonzalez's change of behavior after his removal from the United States seriously undermines his account.  Before the removal, he had no problems contacting Garcia and setting up regular Facetime visits with her and Francisco.  By all outward appearances, the family's relationship returned to what it had been in Cancún, albeit without physical contact.  Gonzalez's ruse was unnecessary.  Gonzalez never adequately articulated why he feared that Garcia would move from the Las Vegas area during the two and one-half month period.

After his removal, he called Garcia, insulted her and threatened to take her child and interfere with her ability to work.  He then needed the assistance of an attorney to reestablish Facetime visits with his son.  He also abruptly ended his house search and efforts to relocate his business.  This behavior is consistent with an unexpected change of plans.  If the home purchase had been a ruse to make Garcia more comfortable in Las Vegas, there was little reason for Gonzalez to discontinue it after his removal and before Garcia was served with process in this action.

The finder of fact at trial has discretion to believe everything a witness says, part of it, or none of it.  The testimony received and evidence admitted has led to the finding that very little of Gonzalez's

14

testimony regarding critical facts is credible.  This finding is based on the level of detail and consistency of the witnesses' testimony, the presence or lack of corroborating evidence and the witnesses' overall demeanor when testifying.

Gonzales claims that between mid-April and late June, 2016, his agreement with Garcia that Francisco should become a permanent resident of the United States and grow up here was a ruse.  The court finds, however, that for this two and one half month period before Gonzalez's failed attempt to enter the United States, he in fact intended to allow Francisco to remain in the United States indefinitely.

### IV. Findings of Fact

In summation, the court makes the following findings of fact: 1) from April 2013 to April 2016, Garcia and Gonzalez did not live together; 2) Garcia and Francisco lived in the Gran Santa Fe II house; 3) Gonzalez maintained a relationship with Delia, which placed significant stress on his relationship with Garcia; 4) on March 28, 2016, an incident occurred that caused Garcia to leave for the United States; 5) after April 4, 2016 Gonzalez made genuine efforts to establish a home for Garcia and Francisco in the United States; and 6) from April 2016 to June 2016, Gonzalez subjectively intended to allow Francisco to remain in the United States indefinitely.

### V. Legal Standard

"Children who are wrongfully removed or retained within the meaning of the [Hague] Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001.

"A court that receives a petition under the Hague Convention may not resolve the questions of who as between the parents, is best suited to have custody of the child."  *Cuellar v. Joyce*, 596 F.3 505, 508 (9th Cir. 2010).  The court's inquiry is narrower one: should the child be returned to his or her

15

country of habitual residence.  "With few narrow exceptions, the court must return the abducted child to its country of habitual residence so that that the court of that country can determine custody."  *Id.*

Under the International Child Abduction Remedies (ICARA), in order to establish a claim under the Hague Convention, a petitioner must show by a preponderance of the evidence "that the child has been wrongfully removed or retained."  22 U.S.C. § 9003(e)(1).

The removal or retention of a child is considered wrongful where –

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001) (quoting Hague Convention, art. 3).

If the petitioner establishes a claim for return, the burden shifts to the respondent to show that an exception should apply.  22 U.S.C. § 9003(e)(2).

A respondent has two approaches for establishing an exception.  A respondent may show by clear and convincing evidence that: 1) "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" or 2) "the return of the child … would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  *Id.* (citing Hague Convention, art. 13(b); 20).  Alternatively, a respondent may demonstrate by a preponderance of the evidence that: 1) if more than one year has elapsed, "the child is now settled in its new environment;" or 2) "the person … having care of the person of the child was not actually exercising custody rights at the time of removal or retention;" or 3) "the person … having care of the person of the child … had consented to or subsequently acquiesced in the removal or retention."  *Id.* (citing Hague Convention, art. 12; 13).

16

## VI. Discussion

1. <u>The Assigned Magistrate Judge May Enter Final Judgment in this Action</u>

"Upon the consent of the parties, a full-time United States magistrate judge … may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case." 28 U.S.C. § 636(c). "Upon written consent of the parties and a reference of a civil case by the district judge to a magistrate judge, a magistrate judge may conduct any or all proceedings in a case, including the conduct of a jury or non-jury trial, and may order the entry of final judgment." LR IB 2-1. "Parties may consent to a trial by a magistrate judge up to the date of trial even though they may have previously declined to sign such a consent." LR IB 2-2(c).

The parties completed this district's consent forms in order to proceed before a magistrate judge. (ECF No. 46)  The district judge assigned to this matter entered an order accordingly.  (*Id.*)  As the parties have complied with Local Rule IB 2-1 and the assigned district judge has referred this action to the assigned magistrate judge, the court has the authority to enter final judgment in this action.

2. <u>The Court May Hear Gonzalez's Petition</u>

  a.  *Effect of the Pretrial Order*

"[W]hen an admission or agreement concerning a factual issue is made at the pretrial conference and is incorporated in the court's pretrial order, that issue stands as fully determined as if it had been adjudicated after the taking of testimony at trial." *Verzosa v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 589 F.2d 974, 977 (9th Cir. 1978)(quoting 6 Wright, Federal Practice & Procedures 1527 p. 605 (1971)).  While, parties may not stipulate to federal jurisdiction over their action, *Singer v. State Farm Mut. Auto Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997), "it is well settled that one may stipulate to facts from which jurisdiction may be inferred." *Verzosa*, 589 F.2d at 977.

The Hague Convention, as enacted by 22 U.S.C. §§ 9001-9011, provides that "[t]he Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights." Hague Convention, art 4.

In the pretrial order, the parties agreed the "Mexican State of Quintana Roo was the habitual residence of the minor child immediately prior to Respondent and the minor child leaving Mexico and coming to Las Vegas, Nevada in April 2016." (ECF No. 20 at 5). The parties and the court proceeded with trial as if Francisco's habitual residence was Quintana Roo, Mexico. On the third day of trial, after a number of witnesses had testified, Garcia moved to amend her answer. Based on evidence adduced at trial, she sought to allege that Francisco's habitual residence was Havana, Cuba.

The United States and Mexico are signatories to the Hague Convention. Cuba is not. If Francisco's habitual residence was Cuba, the court would lack subject matter jurisdiction to hear the petition, as Francisco would have been a habitual resident of a non-Contracting State immediately before his removal. The court denied Garcia's motion to amend. Instead, it construed the motion as a challenge to the court's exercise of subject-matter jurisdiction. The court now takes up this issue.

Although seemingly innocuous at the time the facts were drafted, section 6, paragraph 4 of the pretrial order now takes on new significance. The paragraph is a stipulation to fact from which the court could infer jurisdiction. *Verzosa*, 589 F.2d at 977. Since the court will give full force to the facts stipulated to in the pretrial order, it has been established that Francisco was a habitual resident of Quintana Roo, Mexico immediately before his removal. Thus, the court may hear Gonzalez's petition.

   b. *Habitual Residence Analysis*

Although the parties stipulated that Francisco's habitual residence was Quintana Roo, Mexico, Garcia contends that evidence adduced at trial demonstrate that Francisco's habitual residence was Havana, Cuba. The court disagrees.

18

"Being habitually resident in a place must mean that you are, in some sense, 'settled' there-but it need not mean that's where you plan to leave your bones." *Mozes*, 239 F.3d at 1074. "[C]ourts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.* at 1077. "While the decision to alter a child' habitual residence depends on the settled intentions of the parents, they cannot accomplish this transformation by wishful thinking alone." *Id.* at 1078. "First, it requires an actual 'change in geography. Second, home isn't built in a day. It requires the passage of an appreciable period of time, one that is sufficient for acclimatization." *Id.*

Francisco was born in Cancún, Mexico. Until April 2016, Francisco had always resided in Cancún, apart from a one-month stay in Cuba in April 2014. Garcia maintains that she and Gonzalez agreed that Francisco would live in Cuba. Even if both parents had the requisite intent, Francisco had not lived in Cuba for an "appreciable period of time" and certainly not long enough for him to be acclimated in Cuba. *See id.*

3.     Gonzalez Has Established a Claim for Return under 22 U.S.C. § 9003(e)(1).

    a.     *Under the Laws of the State of Quintana Roo, Gonzalez had Parental Rights Over Francisco*

Courts consult the law of the State of the child's last habitual residence to determine the content of the Petitioner's rights, "while following the Convention's test and structure to decide whether the right at issue is a 'right of custody.'" *Abbott v. Abbott*, 560 U.S. 1, 9, 103 S.Ct. 1983, 1990, 176 L.Ed. 2d 789 (2010)(construing broadly "right of custody" under the Convention). Under the Hague Convention, rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5.

"Article 3 [of the Convention] provides three potential sources of custody rights: (1) operation of law, (2) judicial or administrative decision, or (3) an agreement having legal effect under the law of that

19

State." *Shalit v. Coope*, 182 F.3d 1124, 1129 (9th Cir. 1999). "[A]n attorney's declaration as to the application of another country's law is generally acceptable in Hague Convention cases." *Id.* at 1130 n. 7.

The parties agree that there is also no judicial or administrative decision that adjudicates their parental rights regarding Francisco. Additionally, neither party has presented evidence about an agreement that governs their respective paternal rights. Consequently, each side presented expert testimony about Gonzalez's paternal rights under the civil code of Quintana Roo.

Each side presented expert testimony regarding relevant domestic relations law in the Mexican state of Quintana Roo. Mr. Francisco Javier Suarez Hamz (Suarez) and Mr. Alejandro Guzman-Rivera (Guzman) were qualified as experts on regarding the relevant foreign law.

Gonzalez's expert, attorney Suarez provided the following opinions: (1) the act of registering a child conveyed "patria potestas" to both registering parents; (2) the concept of "patria potestas" conveyed to both parents the full range of paternal rights under Mexican law; and (3) parental rights could only be terminated after a judicial proceeding. Garcia's expert, attorney Guzman opined that in situations where the mother and father reside in separate domiciles, preference with respect to care of the child would be given to the mother.

"The partia potestas right has consistently and right been recognized as a right of custody under the Hague Convention." *Rodriguez v. Sieler*, No. CV 12-167-M-DLC, 2012 WL 5430369 at *5 (D.Mon. Nov. 7, 2012). Under the civil code of Quintana Roo, patria potestas encompasses the rights to the child's care, education, environment, belongings, and general well-being. (Pet'r's Ex. 2)

The parties agree that they registered Francisco together shortly after his birth. (Pet'r's Ex. 3b) According to Suarez, this act of registration conferred onto Gonzalez and Garcia the full range of rights under patria potestas. On cross-examination, Guzman did not refute this interpretation. He

acknowledged that Suarez's opinion was based on the general articles governing parental rights.  In Guzman's opinion, Articles 914 and 915 of the civil code were more specific and thus controlled in this situation.

Based on the experts' testimony, Article 914 and 915 are not applicable to this situation. The articles contemplate a judicial determination before they become legally operative.  For example, Article 914 commands individuals to "convene" and provides an exception in cases "where there is a risk of danger."  Presumably it would be a judge, not the child's mother and father, who would decide whether there was a risk of danger associated with the child remaining with his mother.  Additionally, Articles 914 and 915 address a discrete right under patria potestas: the right to care for the child.  Even if the article could become legally operative without a court adjudication, only one of Gonzalez's parental rights would have been curtailed.

The civil code of Quintana Roo provides that parental rights may only be terminated under six specific circumstances (Pet'r's Ex. 2) and, according to both experts, only after a judicial determination.  The court therefore finds that Gonzalez had custody rights over Francisco. These rights included the right to determine where Francisco was raised.  This right was breached when Garcia removed Francisco to the United States without Gonzalez's knowledge or permission.

      b.     *At the Time of the Removal, Gonzalez was Exercising His Custody Rights*

The Ninth Circuit has placed a minimal burden on petitions with regard to the exercise of parental rights:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody right under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.  Once it determines that the parent exercised custody right *in any manner*, the

21

Court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.

*Asverta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009)(emphasis added).

There is ample evidence in the record that Gonzalez exercised his custody rights.  He provided Francisco with a home, authorized two passports to allow him to travel, and regularly visited him. *Mozes*, 239 F.3d at 1084-85 ("Nor is there any doubt that Arnon was exercising his parental rights and responsibilities up until the time Michal sought custody.  [H]e remained in regular contact with his family, visited them several times, and 'provided all finances needed to support his wife and children in California.'")  Up until April 4, 2016, Gonzalez was visiting Francisco at least 4-5 times a week even after his relationship with Garcia had ended.  *Giles v. Bravo*, No. 2:11-cv-1600-PMP-CWH, 2012 WL 704910 at *4 (D.Nev. Jan. 27, 2012)("Whether a parent was exercising her custody rights has been liberally construed to include whenever a parent keeps, or seeks to keep, any sort of regular contact with his or her child.")  Thus, Gonzalez has met his burden to show that he was exercising his right to custody at the time of the removal.

Conversely, Garcia has failed to establish, by a preponderance of the evidence, her defense that Gonzalez was not exercising his right to custody.  The preceding description of Gonzalez's actions is based on her account of the couple's relationship.  Even under her less than favorable assessment of the situation, it is clear that Gonzalez took an active role in Francisco's life right up to the time of removal.

4.    Garcia Has Shown the Acquiesce Exception Applies

a.    *Consent or Acquiescence*

"'Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow.  The consent defense involves the petitioner's conduct prior to the contested removal ore retention, while acquiescence addresses whether the petitioner subsequently

22

agreed to or accepted the removal or retention.'" *Garza-Castillo v. Guajardo-Ochoa*, No. 2:10-cv-359-LDG (VCF), 2012 WL 523696 at *1 (D.Nev. Feb. 15, 2012)(quoting *Baxter v. Baxter*, 423 F.3d 363, 372 (3rd Cir. 2005)).

i.   Consent

"[A]mbiguous statements or actions don't suffice; the Convention requires the parent opposing removal to unequivocally demonstrate that [the petitioning parent] consent to the child's indefinite stay." *Cuellar*, 596 F.3d at 512.

Garcia has not satisfied her burden of showing that Gonzalez consented to Francisco being taken to the United States.  Garcia's consent argument relies on the contingency plan set up after the February 2015 incident.  According to the plan, if the relationship deteriorated again, Garcia would take Francisco and flee to Cuba.  Gonzalez had previously authorized Francisco's Cuban passport and allowed him to become a Cuban national in order to facilitate the contemplated escape route.  Gonzalez's actions cannot be interpreted as consent to an indefinite stay. *See id.*

Given the "on-again, off-again" nature of the couple's relationship, it is highly likely that Gonzalez intended Cuba to be a temporary refuge for mother and son.  They would stay there until Gonzalez eventually reconciled with Garcia; at which point Garcia and Francisco would return to Mexico.  Even if the court construed the authorizations as consent, which it does not, the consent would be limited to resettlement in Cuba.  Neither party appeared to contemplate relocation to the United States until after April 4, 2016.

ii.   Acquiescence

Garcia has however satisfied her burden of showing that Gonzalez subsequently acquiesced to Francisco remaining in the United States.

23

"[A]cquiescence under the Convention requires either: [1] an act or statement with the requisite formality, such as testimony in a judicial proceeding; [2] a convincing written renunciation of rights; or [3] a consistent attitude of acquiescence over a significant period of time." *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996). "Courts have held the acquiescence inquiry turns on the *subjective intent* of the parent who is claimed to have acquiesced." *Rehder v. Rehder*, No. C14-1242 RAJ, 2014 WL 7240662 at* 5 (W.D.Wa. Dec. 19, 2014)(emphasis in original).

Gonzalez never performed a formal act or made a formal statement of acquiescence. No convincing written renunciation of rights was admitted into evidence. The court's acquiesce analysis focuses on the third option: "a consistent attitude of acquiescence over a significant period of time."[12] *Friedrich*, 78 F.3d at 1070. This analysis is made in the context of a finding of fact that, from mid-April, 2016, until late June, 2016, Gonzales subjectively intended that Francisco remain in the United States indefinitely.

*Friedrich* and the cases which cite it, do not offer any guidance on what should be considered a "consistent attitude" or what constitutes a "significant period of time." The cases tend to present situations on the extremes of the acquiescence analysis.

In *Friedrich*, the alleged acquiescence was based on a single comment made to a third party after the removal. 78 F.3d at 1069 (holding that the isolated comment was insufficient evidence of acquiescence). Similarly, in *Rehder*, the petitioner's seemingly definitive text messages, "[f]arewell Tanya, give my boy a last big hug from me as I will not see him anymore" and "use my card and f— king go to America and never comeback," were found not be constitute acquiescence when read in light of the parties' melodramatic communication style. WL 7240662 at *5-6.

---

[12] Although a number of Ninth Circuit decisions have cited *Friedrich*, none have cited it for its rule on acquiesce. *Cuellar*, 596 F.3d 505; *Asveta*, 580 F.3d 1000; *Gaudin v. Remis*, 415 F.3d 1028 (9th Cir. 2005).

At the other extreme, a petitioner who makes no efforts to obtain the return of her child for over a year, despite knowing the child's location and having the means to contact her and the respondents, acquiesces to the child's removal. *Giles*, 2012 WL 704910 at *7. Alternatively, a petitioner may acquiesce if he or she takes affirmative steps to help his child become established in a new home. *Culculoglu v. Culculoglu*, No.2:13-cv-446-GMN-CWH, 2013 WL 4045905 at *11 (D.Nev. Aug. 8, 2013)(finding that a petition had acquiesced to removal when he had purchased his children's plane tickets to the United States, provided their mother with monthly support, and did not object when she rented a home and enrolled the children in school).

From these cases, the court distills two rules: 1) action is a stronger indicator of acquiesce than inaction, *compare Giles*, 2012 WL 704910 at *7 (finding inaction over a 12-month period was acquiescence), *with Culculoglu*, 2013 WL 4045905 at *11(finding a 4-month period of active support was acquiescence), and 2) the more unambiguous the indictors of acquiesce are, the shorter a period of the time the petitioner's behavior needs to continue before a court may find that the petitioner has acquiesced to the removal. *See Culculoglu*, 2013 WL 4045905 at *11. When these rules are applied this action, the court finds that Gonzalez did acquiesce to Francisco remaining in the United States indefinitely.

On surface, Gonzalez's behavior on April 4 and 5 are consistent with his position that he did not acquiesce. In text messages sent on those two days, he accused Garcia of child abduction and threatened to go to the authorities. (Pet'r's Ex. 34b) His comments were made in the context of the uncertainty surrounding Francisco's disappearance. (*Id.*) However, his initial anger became acceptance and then enthusiasm.

Consistent with his behavior throughout his relationship with Garcia, Gonzalez had a change of heart once he learned that Francisco was in the United States. He quickly reestablished contact with

25

Garcia and rekindled their romance.  Garcia credible testified that Gonzalez commented that it would be better if Francisco grew up in the United States and that on at least one occasion the couple had phone sex.  From about mid-April 2016 to late June 2016, Gonzalez began helping mother and son get established in Las Vegas: 1) he contacted a realtor to look for a home; 2) he sent gifts and financial support; and 3) he sent his brother Elpidio to establish businesses in the Las Vegas area.

This is similar to the *Culculoglu* petitioner's conduct.  In *Culculoglu*, the petitioner, who lived in Canada: 1) provided monthly support to his wife and children, who were living in the United States; 2) discussed homes his family could rent; and 3) helped his wife enroll the children in school in the United States.  2013 WL 4045905 at *3.  The court found that the petitioner's actions, which occurred over an approximately four-and-a-half-month period, manifested acquiescence to his children remaining in the United States indefinitely.  *Id.* at *11.  Here, Gonzalez provided Garcia and Francisco financial support, even going so far as to locate a realtor for assistance in buying a home in Las Vegas.

Gonzalez maintains that it was not his subjective intent to allow Francisco to remain in the United States.  He testified that his actions between April and June 2016 were all a ruse to prevent Garcia from leaving the Las Vegas area.  The court finds that this explanation is not credible.  Gonzalez offered no rational explanation for his belief that Garcia would leave the Las Vegas area and hide from him, especially given that her mother, grandmother, and step father were living with her and her son.  Had Gonzalez's explanation of a pretext been true, he would have kept up the ruse up until the time Garcia was served with the petition.

On this record, the court concludes that Gonzalez's actions were motivated by his subjective intent to allow Garcia to keep Francisco in the United States.  He provided financial support for his child including taking the extraordinary step of looking for a house for him. *See Culculoglu*, 2013 WL 4045905 at *11.  He maintained contact with the child and Garcia and on at least one occasion expressed

26

a desire for Francisco to remain in the United States.  Further supporting this conclusion, Gonzalez took steps to relocate to the United States.  He explored the possibility of setting up businesses in the United States, he sold his car, and had Delia sell their current home.  In short, for a period of two and a half months, Gonzalez demonstrated a consistent attitude of acquiescence.  Given the unambiguous nature of Gonzalez's actions, the tumultuous nature of the couple's relationship, and the court's factual findings regarding Gonzalez's subjective intent from April 2016 to June 2016, the court finds that two and one half months was a sufficiently significant period of time to support a finding of acquiescence by a preponderance of the evidence.

> b.    *There is No Grave Risk of Harm if Francisco is Returned to Mexico*

"[T]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005)(quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)).  "Rather, the question is whether the child would suffer serious abuse, that is a great deal more than minimal." *Id.*

Garcia testified that Gonzalez was physically and verbally abusive to her.  Gonzalez allegedly forcibly kissed Garcia, grabbed her face, and raped her.  Perhaps most disturbing is Garcia's allegation that Gonzalez planned to have her killed while Francisco was in the car with her.  The alleged abuse is troubling.  No child should be forced to grow up in an environment where domestic violence is a common occurrence.

Article 13 of the Convention addresses the grave risk of harm exception.  A respondent must show that the child was harmed in its state of habitual residence or faces a strong likelihood of harm if returned.  "Only evidence directly establishing the existence of a grave risk of harm that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." *Oddy v. Morris*, Civil No. 11-715 LEK-KSC, 2012 WL 464227 at *9

27

(D.Haw. Feb 10, 2012).  It is critical to note that the burden on the respondent is high, with ICARA stating that the burden requires "clear and convincing evidence."  22 U.S.C. § 9003 (e)(2)(A).

There was no evidence of any abuse directed towards Francisco.  Allegations of abuse directed at Garcia, even if true, do not establish that Francisco would be subject to a grave risk of harm.  *Oddy*, , 2012 WL 464227 at *9("It is clear that the parties' relationship was troubled both during and after the marriage, when Petitioner was abusive toward Respondent, and that Respondent believed that matters were deteriorating in the months before she removed the children. The Court, however, finds that, as troubling as this behavior may be, Respondent has not established for purposes of article 13(b) analysis that the children would suffer serious abuse that is a great deal more than minimal."); *see also Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000)(holding verbal and physical abuse directed towards spouse was insufficient to establish a grave risk of harm).

ACCORDINGLY, and for good cause shown,

IT IS HEREBY ORDERED that Vladimir Gonzalez Ambrioso's petition for return of his child (ECF No. 1) is DENIED.  The child, Vladimir Francisco Gonzalez Garcia, may remain in the United States.

IT IS FURTHER ORDERED that the order enjoining Garcia from removing Francisco from Nevada (ECF No. 11) is DISSOLVED.  Garcia and Francisco are free to travel within the restrictions imposed on them by their immigration status.

IT IS FURTHER ORDERED that defense counsel return Garcia's and Francisco's passports.

FINAL JUDGMENT shall be entered, accordingly.

DATED this 3rd day of January, 2017.

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE